# UNITED STATES DISTRICT COURT
# DISTRICT OF ALASKA

UNITED STATES OF AMERICA for
the use of J&L PAVING LLC,

    Plaintiff,

vs.

ROCKFORD CORPORATION and
LIBERTY MUTUAL INSURANCE
COMPANY,

    Defendants.

3:18-CV-00156 JWS

ORDER AND OPINION

[Re: Motions at dockets 36, 37 & 46]

## I. MOTIONS PRESENTED

At docket 36 Plaintiff J&L Paving, LLC (J&L) moves for summary judgment on its claims for payment under a subcontract against Defendants Rockford Corporation (Rockford) and Liberty Mutual Insurance Company.[1] Defendants respond at docket 38 and submit a cross-motion for summary judgment at docket 37. Plaintiff replies at docket 41 and responds to the cross-motion at docket 40. Defendants reply to their cross motion at docket 45. Oral argument was requested at docket 46, but argument would not be of assistance to the court.

---

[1] Rockford obtained a payment bond from Liberty Mutual Insurance Company as required by the Miller Act, 40 U.S.C. §§ 3131-3134.

-1-

## II. BACKGROUND

This case is a payment dispute between a general contractor, Rockford, and its subcontractor, J&L, for paving work J&L performed as part of a government contract Rockford had with the United State Army Corps of Engineers to replace the existing military fueling station at Tinker Air Force Base in Oklahoma (the Prime Contract). Under Rockford's subcontract with J&L (the Subcontract), Rockford agreed to pay J&L $274,620 to complete the paving work required under the Prime Contract.[2] The work required both the application of pre-asphalt bituminous coating and the laying of asphalt. Rockford asserts that J&L materially breached the Subcontract in both its application of the bituminous coating and in the laying of the asphalt, causing damages to Rockford in amounts that almost equal the value of the Subcontract. Although Rockford has received payment from the government pursuant to the Prime Contract for completion of the fueling station project, including the paving work, it has not paid J&L.[3] Rockford believes it is entitled to offset the damages it incurred against payments to J&L under the Subcontract.

J&L moves for summary judgment on its contractual claims, arguing it is entitled to be paid the full amount under the Subcontract. The issue it asks the court to resolve as a matter of law, however, is not whether it breached the Subcontract, but rather whether Rockford can withhold payment from J&L after applying for payment and being paid by the government under the Prime Contract. J&L argues that regardless of any breaches on its part, Rockford is required to pay the full Subcontract price because it

---

[2] The parties concede that a subsequent change order increased the Subcontract amount by $4,679.62. Rockford contends that it immediately paid J&L the additional amount. J&L admits that it received $4,679.62 from Rockford, although it points out that the record remains unclear as to when Rockford made the payment and as to whether Rockford submitted a payment request under the Prime Contract to cover this amount. In any event, the amount of the Subcontract effectively remained $274,620 for the duration of the project and is the amount listed on the contract documents and in Rockford's payment applications.

[3] The parties concede that J&L has not been paid apart from the initial payment of $4,679.62.

certified to the government, pursuant to the Prompt Payment Act, that J&L would be paid for its satisfactory work under the Subcontract. J&L asserts that Rockford's certifications constitute a waiver of any right to claim and offset damages or at least bar such a defense under the doctrine of quasi-estoppel.

In its response to Rockford's cross motion, J&L also asks that the court strike or disregard the affidavit of Lonny Rhude, which Rockford included as evidence supporting its motion. J&L argues that Rhude's affidavit is not based on his personal knowledge of events and contains legal conclusions and impermissible characterizations of the contents of business documents and communications attached to his affidavit. Rhude's affidavit is admissible to authenticate the attached business records and to establish certain facts that are within his knowledge. The court did not rely on any legal conclusions or characterizations of evidence offered by Rhude.

### III. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] The materiality requirement ensures that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[5] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[6] However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[7]

---

[4] Fed. R. Civ. P. 56(a).

[5] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[6] *Id.*

[7] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[8] Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not present evidence to show that summary judgment is warranted; it need only point out the lack of any genuine dispute as to material fact.[9] Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[10] All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[11] However, the non-moving party may not rest upon mere allegations or denials but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[12]

## IV. DISCUSSION

### A. Prompt Payment Act

The Subcontract with J&L to perform a portion of work required under Rockford's Prime Contract with the government was subject to the Prompt Payment Act[13] and the Act's implementing regulations. Pursuant to these statutes and regulations, when requesting a progress payment from the government under a prime contract, the contractor is required to itemize work performed by its subcontractors.[14] The contractor must make certain representations concerning its subcontractors' work—namely, that

---

[8] *Id.* at 323.

[9] *Id.* at 323-25.

[10] *Anderson,* 477 U.S. at 248-49.

[11] *Id.* at 255.

[12] *Id.* at 248-49.

[13] 31 U.S.C. § 3901, *et seq.*

[14] 48 C.F.R. § 52.232-5(b)(1).

-4-

the requested amount is for work performed in accordance with specifications of the contract; that all payments due to subcontractors under previous payment requests have been made and payments will be made to subcontractors for work itemized under the current request; and that the payment request "does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract."[15] The contractor is also allowed to assert that the certification "is not to be construed as final acceptance of a subcontractor's performance."[16]

The contractor cannot request payment from the government for deficient work.[17] If a contractor makes a payment request to the government certifying that no payments have been withheld and receives payment for work completed by a subcontractor but then discovers that the work is not in fact satisfactory, it must notify the subcontractor and government and pay the government interest on the amount received from the government but withheld.[18]

Rockford requested payment from the government for J&L's work on March 20, 2017, after J&L had finished the paving work. The total amount requested was $234,882.70, which is about $40,000 less than the amount owed to J&L under the Subcontract.[19] Rockford contends that it deducted this amount from what was owed J&L under the Subcontract through a change order and that it did so in order to cover the costs it incurred to remediate an environmental hazard allegedly caused by J&L's

---

[15] 31 U.S.C. § 3903(b)(1)(B); 48 C.F.R. § 52.232-5(c).

[16] 48 C.F.R. § 52.232-5(c)(4).

[17] 31 U.S.C. § 3905(h).

[18] 31 U.S.C. § 3905(e); 48 C.F.R. § 52.232-5(d).

[19] Doc. 35-4 at p. 1.

application of pre-asphalt coating before a forecasted rain event.[20] The record shows that there had been communications between J&L and Rockford about the clean up and that J&L knew that Rockford believed J&L was responsible for clean-up costs.[21]

One day after Rockford submitted its March payment application, government engineers informed Rockford that J&L's work did not met project specifications. J&L submitted a proposal as to how to correct the deficiencies in its work and eventually completed the rework in early August of 2017.[22]

In October of 2017, Rockford submitted another payment application. This one included a request for the balance of the J&L subcontract, which was about $40,000 (the amount they had not asked for in the previous application).[23] As described above, in order to obtain payment, Rockford had to itemize its subcontractors' work for which it sought payment and certify that such work was completed according to the specifications of the contract. It also had to certify that payments due to subcontractors under previous payment requests had been made and that it did not intend to withhold any payments. Despite this certification, Rockford had not yet paid J&L from the proceeds of the prior payment request and intended to withhold the balance that it was asking for in the current payment request.

The parties do not dispute that Rockford failed to comply with the required withholding procedures and that its October certification was incorrect. Rockford, however, asserts that its noncompliance is an issue between it and the government and does not have any bearing on this contractual dispute between private entities.

---

[20]Doc. 35-8 at pp. 2, 3 7; doc. 35-8.

[21]Doc. 35 at ¶¶ 7-8; Doc. 35-3 at p.1.

[22]Doc. 35 at ¶¶ 11-13; doc. 35-5; doc. 39-5.

[23]Doc. 35 at ¶ 14; Doc. 35-6.

Rockford has since informed the government of its errors.[24] While J&L concedes that it cannot enforce the provisions of the Prompt Payment Act through this lawsuit, it nonetheless argues that Rockford's false certifications and its failure to provide the required notice affect the equities of this contractual dispute. J&L believes Rockford's false representations and inconsistent positions as to J&L's performance and the withholding now bar Rockford from denying full payment to J&L.

**B.    Waiver**

J&L asserts that Rockford's actions amount to a waiver of its right to deny J&L payment based on performance when it averred to the government that J&L's performance met contractual standards and would not be subject to withholdings. Waiver may "be implied from a party's conduct" if that conduct is "clear and unambiguous."[25] "An implied waiver arises where the course of conduct pursued evidences an intention to waive a right, or is inconsistent with any other intention than a waiver, or where neglect to insist upon the right results in prejudice to another party."[26] Conduct that could be a result of a mistake, negligence, or incompetence does not constitute an unequivocal waiver of a right.[27]

As for J&L's performance, Rockford's payment certifications did in fact indicate that J&L's work met the specifications of the contract, but the certifications also made clear that they were not to be construed as a final acceptance of the subcontractor's work. Thus, the payment certifications did not clearly and unambiguously set out Rockford's acceptance of J&L's performance or an abandonment of any claim for damages. J&L does not provide evidence to show that it even received a copy of the certifications; instead, the record shows that Rockford consistently communicated with

---

[24]Doc. 35-8.

[25]*Powers v. United Servs. Auto. Ass'n*, 6 P.3d 294, 298-99 (Alaska 2000).

[26]*Milne v. Anderson*, 576 P.2d 109, 112 (Alaska 1978).

[27]*Airoulofski v. State*, 922 P.2d 889, 895 (Alaska 1996).

J&L about its deficient performance. It informed J&L about the need to cure the defects in the paving shortly after learning of the problems, and J&L knew that its work had to be redone.[28] The record also shows that Rockford informed J&L that it believed the resulting delays caused damages for which J&L was liable.[29] At best, Rockford's conduct as a whole—looking at the government certifications and Rockford's communication's with J&L—was ambiguous as to J&L's performance.

As for Rockford's intention to withhold payment to J&L to offset alleged damages, the October 2017 certification indeed included a misrepresentation about its plans to pay J&L. Again, this certification was made to the government and not J&L. The record shows that Rockford communicated its belief that J&L was liable for damages as a result of its performance and that it had used deductive change orders to the Subcontract to reduce the amount owed to J&L in order to offset those damages.[30] Given these communications by Rockford, along with the fact that Rockford continues to withhold J&L's payment,[31] this court is prevented from finding an unequivocal waiver based on Rockford's submission of a contrary government certification—one that J&L does not contend it even received or saw.

J&L also asserts that Rockford's failure to send the requisite withholding notices under 31 U.S.C. § 3905(e) amounts to an intentional waiver of its right to withhold disputed payments from J&L. However, as noted by Rockford in its reply brief, § 3905 cannot be used in this dispute to determine the parties' rights under the Subcontract:

---

[28] Docs. 35-5; 39-5; 35-9 at p.15; 39-7.

[29] Docs. 35-5; 35-8 at p. 42; 35-8 at pp. 43-47; 39-7.

[30] Docs. 35-3; 35-5; 35-8 at p. 5-10; 35-8 at pp. 37, 42, 43-47; 39-7.

[31] *See Duenas-Rendon v. Wells Fargo Bank, N.A.*, 354 P.3d 1037, 1042 (Alaska 2015) (affirming the superior court's ruling that mortgagee bank did not waive its right to foreclose by accepting monthly payments after notice of mortgagor's default because the bank's conduct of continuing the foreclosure after receiving the payments was consistent with exercising that right).

> [T]his section shall not limit or impair any contractual, administrative, or judicial remedies otherwise available to a contractor or a subcontractor in the event of a dispute involving late payment or nonpayment by a prime contractor or deficient subcontract performance or nonperformance by a subcontractor.[32]

Also, the failure to send formal notice cannot be considered in isolation. As noted above, the record shows that J&L knew about its deficient performance. Indeed, it proposed a cure and eventually fixed its original work.[33] Rockford thereafter informed J&L of its intention to assert a claim for damages because of the delayed performance.[34] There is no reasonable basis to conclude that the failure to send the § 3905 notices conveyed a message that Rockford was waiving its ability to assert a claim for damages based on deficient performance.

Rockford's certification to the government regarding performance and withholding and its failure to provide formal notice under the Prompt Payment Act could very likely be the product of something other than intentional waiver of a claim for damages, such as negligence or incompetence in reading and filling out the government's form for payment and understanding the requirements of the Prompt Payment Act submissions. Given these other possible explanations for Rockford's Prompt Payment Act missteps, the court cannot conclude that through these actions Rockford clearly intended to abandon its claim for damages stemming from J&L's delayed performance and its intention to offset those damages.

**C.      Quasi-Estoppel**

J&L also argues that the doctrine of quasi-estoppel bars Rockford from denying J&L payment for its work under the Subcontract. "Quasi-estoppel . . . appeals to the conscience of the court to prevent injustice by precluding a party from asserting a right

---

[32] 31 U.S.C. § 3905(j).

[33] Docs. 35-5; 39-5; 35-9 at p.15; 39-7.

[34] Docs. 35-5; 35-8 at p. 42; 39-7.

inconsistent with a position previously taken by him . . . ."[35]  "The essence of the doctrine of quasi-estoppel is the existence of facts and circumstances making the assertion of an inconsistent position unconscionable."[36]  Unlike estoppel, quasi-estoppel does not require a showing of reliance as an essential element; however, reliance is one factor for the court to consider.[37]  Other factors include

> whether the party asserting the inconsistent position has gained an advantage or produced some disadvantage through the first position; whether the inconsistency was of such significance as to make the present assertion unconscionable; and, whether the first assertion was based on full knowledge of the facts.[38]

Given the equitable nature of the doctrine, the issue is one that is appropriately decided by the court.[39]

      The court is not persuaded that Rockford's erroneous certifications to the government provide a basis for J&L to assert quasi-estoppel in this contract dispute between the parties.  As noted by Rockford in its briefing, J&L is not the aggrieved party in relation to the misrepresentations made in Rockford's request to be paid pursuant to the Prime Contract.  The government is.  J&L does not assert, and the record does not show, that J&L was privy to these payment applications.  Rather, as discussed above, the record shows that Rockford took a consistent position with J&L concerning its performance and the issue of damages.  Therefore, the false certification has little significance to the parties' current contract dispute.  Also diminishing the significant of Rockford's inconsistency is the fact that there is no evidence of bad faith in the record; that is, Rockford's false certification could be a result of negligence or incompetence.

---

[35]*Jamison v. Consol. Utils., Inc.*, 576 P.2d 97, 102 (Alaska 1978).

[36]*Id.*

[37]*Id.* at 102-03.

[38]*Id.* at 103.

[39]*See Alaska Interstate Constr., LLC v. Pac. Diversified Inv., Inc.*, 279 P.3d 1156, 1179, 1180 (Alaska 2012).

-10-

The fact that Rockford may have improperly benefitted from not disclosing its withholding—by avoiding interest payments or other penalties under the applicable federal statutes—or may have violated the False Claims Act is a matter for the government to address. It does not make Rockford's long-standing claim for damages against J&L in this contract dispute unconscionable.

Similarly, Rockford's failure to send the requisite notice under 31 U.S.C. § 3905(e) does not amount to unconscionable conduct justifying the application of quasi-estoppel. Aside from the fact that § 3905(j) prevents the issue from limiting Rockford's contractual rights, Rockford, as noted above, took a consistent position with J&L. J&L knew what was needed to cure its paving work and did so and knew that the issue of damages stemming from delays remained unsettled. The court is hard pressed to see how any unconscionable situation arose from the lack of a § 3905(e) notice.

## V. CONCLUSION

Plaintiff's motion at docket 36 is DENIED. Defendants' cross-motion at docket 37 is GRANTED—Rockford is not barred by virtue of its payment applications to the government or failure to send notices under 31 U.S.C. § 3905(e) from arguing that J&L breached the Subcontract, thereby entitling it to offset any resulting damages against J&L's payment. The motion for oral argument at docket 46 is DENIED.

DATED this 3rd day of May 2019.

/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT COURT